**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSE MEDINA, | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 04-CV-128 |
| | : | |
| | : | |
| DAVID DIGUGLIELMO, et al., | : | |
| Respondents. | : | |

**MEMORANDUM AND ORDER**

**Anita B. Brody, J.**                                                    **June 2, 2005**


Jose Medina ("Medina") petitions this court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  For the following reasons, Medina's petition is granted.


**I.  FACTUAL BACKGROUND**

On November 12, 1992, after a jury trial before the Honorable Juanita Kidd Stout in the

Philadelphia Court of Common Pleas, Medina was found guilty of first degree murder, robbery

and possession of instruments of crime in connection with the October 18, 1991 death of William

Bogan ("Bogan") and was sentenced to life imprisonment without parole.[1]

At trial, the Commonwealth presented evidence that Bogan was stabbed in the heart near

Mutter and Gurney Streets in Philadelphia.  (Tr. 11/6/92 at 189-90, 206.)  The stab wound was

ultimately caused by a knife with a six-inch, single-edged blade.  (Id. at 207.)  Although this

---

[1]This sentence was first appealed to the Pennsylvania Superior Court in Commonwealth
v. Medina, 3885 Philadelphia 1993 at 1-3 (Pa. Super. Ct. Aug. 31, 1995) (hereinafter "Medina
I").

wound was fatal, Bogan was able to run for about two blocks before collapsing in the street.  (Tr. 11/6/92 at 150, 189, 212-13.)  When the police found Bogan in the intersection of Hope and Gurney Streets, he was already dead.  (Tr. 11/6/92 at 172-73.)

On the night that Bogan was killed, Philadelphia police stopped Medina at approximately 9:30 pm at Mutter and Cambria Streets.  (Tr. 11/6/92 at 166-67.)  A police officer stopped and frisked Medina because Medina, dressed in a white sweatshirt, matched the description in a radio report about a male in a white sweatshirt carrying a knife.  (Id. at 176.)  The officer found no weapons on Medina and let him go.  (Id. at 166-67.)  Several minutes later, after discovering the body of Bogan, the police found Medina in a local bar and arrested him.  (Id. at 172-74.)  No blood was found on Medina's white sweatshirt.  (Id. at 181.)   No knife was ever recovered. Medina I at 19.

At trial, the Commonwealth presented the testimony of Hector Toro ("Hector"), Maria Caraballo ("Caraballo"), and Michael "Marcos" Toro ("Marcos").[2]  Hector was 10 years old on the date of the incident.  (Tr. 11/5/92 at 39-81.)  Hector testified that he and his brother, Marcos, saw Medina (a.k.a. "Harry") at a neighborhood store (the "Chinese store") at approximately 8:30 or 9:00 pm on October 18, 1991.  (Id. at 43-46.)  Hector testified that Medina had a knife and that Medina stated that he was going to kill someone.  (Id.)  Hector testified that after Medina left the store, Hector and Marcos also left the store and returned to their grandmother's house on Mutter Street.  (Id. at 46-47.)  While Hector's testimony was unclear as to his exact activities after he

---

[2]The Commonwealth also presented the testimony of the police officers who arrived on the scene and who arrested Medina, the testimony of a medical examiner, and the testimony of people who knew Bogan.  However, Hector Toro, Marcos Toro, and Maria Caraballo were the only witnesses who testified to seeing Bogan and Medina before Bogan was killed.

returned to his grandmother's house, his testimony indicated that, at some point, Hector left his grandmother's house, went to the corner of Mutter and Gurney Streets, and saw Bogan's body in the street. (Id.)  Hector did not witness Bogan being stabbed.  (Id. at 47-48.)

Maria Caraballo ("Caraballo"), a neighbor of the Toro brothers, also testified at trial.  (Tr. 11/6/92 at 146-64.)  Caraballo was sitting on the front steps of her house on the evening of the murder. (Id. at 147-50.)  At approximately 9:15 or 9:30 pm, she saw Bogan run past her house while holding his chest.  (Id. at 150.)  Caraballo tried to follow Bogan to offer assistance but could not find him.  (Id. at 151.)  As she returned to her house, she saw Medina looking underneath a car parked across the street.  (Id. at 152-53.)  Although Caraballo saw Bogan running by her house, she did not see him being stabbed.  (Id. at 156.)

Marcos, who was 11 years old at the time of the incident and 12 years old at the time of trial, was the only trial witness who testified about the substantive homicidal act itself.  (Tr. 11/5/92 at 83, 97, 105); Medina I at 3, 8-11.  At the beginning of Marcos's testimony, when asked, "Do you know the difference between telling the truth and telling a lie," Marcos answered, "No." (Tr. 11/5/92 at 83.)  Marcos then proceeded to testify that he saw Medina stab Bogan.  (Id. at 97.)  However, upon cross-examination, Marcos confirmed his preliminary hearing testimony that he did not actually see Medina stab Bogan and that he only assumed Medina stabbed Bogan because of what his brother Hector had told him and because he had seen Medina with a knife earlier in the day.  (Id. at 110-11.)  At no point did Medina's trial counsel object to Marcos Toro's competency to testify.

Because it is central to Medina's claims, I will take the time to review in detail Marcos's preliminary hearing and trial testimonies.  At the preliminary hearing held on November 26,

3

1991, Marcos testified that, while looking out of his window, he saw Medina stab Bogan:

> [By the prosecution, Ms. Ponterio]
> Q. Tell the Judge what you saw when you looked out your window?
> A. The dude [Bogan] with his hands on his heart.
> . . .
> Q. And where did you see him first?
> A. I don't know.
> Q. Okay. What did you see him doing, the white dude [Bogan]?
> A. I didn't see that part.
> Q. Okay. Tell us the part that you saw? Did you see Harry [Medina] when you were looking out your window?
> Mr. Silverstein [defense counsel]: Objection. Leading nature.
> The Court: Overruled.
> By Ms. Ponterio:
> Q. You can answer?
> A. Yes.
> Q. Okay. And what was Harry doing?
> A. Chasing after him.
> Q. Okay. You are saying chasing after the white dude?
> A. A-huh.
> Q. Okay. Did Harry catch up to the white dude?
> A. No.
> Q. Do you know what I mean by catch up?
> A. Yes.
> Q. Okay. What did you see Harry do with the white dude?
> A. Stabbed him.

(Tr. 11/26/91 at 8-10.) However, on cross-examination at the preliminary hearing, Marcos

testified that he did not actually see Medina stab Bogan:

> [By defense counsel]
> Q. Now, you said you looked out the window and you saw this white gentleman [Bogan] holding his heart; is that right?
> A. Yes.
> Q. Did you see anything happen before that?
> A. No.
> Q. You didn't see anything happen before that?
> A. (Witness shakes head)
> . . .
> Q. Did you see Harry [Medina] when this white fellow was

4

running down the street holding his heart?
A. No.
Q. You did not see Harry?
A. No.
. . .
Q. In fact, you didn't see Harry stab the guy, did you?
A. My brother did.
Q. Your brother did.  And you are only telling us what your brother told you; is that right?
A. A-huh.
Q. And you didn't eyewitness Harry do anything; right?  Am I correct?  You have to say yes or no?
A. Yes.
Q. And you only assumed that because you saw a knife at the restaurant; is that right?
A. A-huh.
Q. So everything you said about Harry stabbing the white dude is either something that your brother told you or you made up because you figured he did it because he had a knife; right?
A. Yes.

(Id. at 21-23.)

Medina's trial began on November 5, 1992, approximately one year after the preliminary hearing.  Marcos's trial testimony started with the prosecutor's examination of Marcos's understanding of the duty to speak the truth:

Q. [By the prosecution, Ms. Sweeney]  Do you know what it means to tell the truth?
A. [By Marcos]  Yes.
Q. What does it mean?
A. (No response.)
Q. Let me ask it the other way. Do you know what it means to tell a lie?
A. No.
Q. Do you know the difference between telling the truth and telling a lie?
A. No.
Q. You just told the jury and the judge when you put your hand on the Bible you were going to tell the truth?
A. Truth.

5

Q. What does the truth mean?

THE COURT: First of all, let's sit up straight and take our hand down. What happens to you if you tell a lie?

(No response.)

THE COURT: What happens to you? Take your hand down and look at me. Tell me what will happen to you if you tell a lie?

(No response.)

. . .

THE COURT: Tell me what will happen to you if you tell a lie? What would the teacher – what would your mother do to you? What would your father do to you? What would happen to you?

BY MS SWEENEY [the prosecution]:

Q. Marcos, you have to give an answer if you know the answer. What would happen to you if you tell a lie? Do you get rewarded?

A. No.

Q. Do you get a prize for telling a lie?

A. No.

Q. Do you get in trouble for telling a lie?

A. Yes.

Q. What about when you tell the truth? If you tell the truth? If you tell the truth, is that a good thing to do?

A. No.

THE COURT: It is not good to tell the truth?

A. Yes.

MS. SWEENEY: Sit back.  Nobody is going to hurt you.  Sit back. If you want some water, if you want a Kleenex or if you say, "Boy I need a break," you just let us know.  All right?

THE WITNESS: Yes.

BY MS. SWEENEY:

Q. We want you to tell the truth about what you may have seen and heard about a year ago involving the white dude [Bogan].  Do you know what I am talking about?

A. No.

MR. DALY [defense counsel]: I object to the leading nature of the question.

THE COURT: Overruled.  You don't know what she is talking about?

WITNESS: No.

(Tr. 11/5/92 at 83-86.)

Marcos testified on direct examination that he saw Bogan stab Medina.  However,

6

Marcos's description of Medina's and Bogan's actions contradicted itself:

> BY MS. SWEENEY [prosecution]:
> Q. Marcos, after you went home to your house, what did you see happen which is why you came to court today?
> A. (Pause.) Because he stabbed somebody.
> Q. Who stabbed somebody?
> A. Harry [Medina].
> . . .
> Q. Where did Harry stab the white man [Bogan]?  By that, I mean where on the white man did the defendant Harry stab?
> A. Chest.
> Q. Show me where.  Point to it?
> A. (Witness indicates.)
> Q. Indicating right there.  Did you see the white man fall down?
> A. Yes.
> Q. Where?
> A. Gurney.
> THE COURT: We want to see you handsome face.  Sit up.
> BY MS. SWEENEY:
> Q. After you saw him, meaning the white man, fall down on Gurney Street, did you see anybody do anything?
> A. No.
> Q. What happened after the white man fell down on Gurney Street?
> A. (Pause.)
> Q. Did you see anyone at all go over to the white man after he fell down?
> A. No.
> THE COURT: Keep your head up, and put your rope down.
> BY MS. SWEENEY:
> Q. Did you see Harry again after he stabbed the white man?
> A. No.
> . . .
> BY MS. SWEENEY:
> Q.  I will back you up just for a minute.  Before Harry stabbed the white guy, did anyone say anything?
> A. No.
> . . .
> Q. Marcos, when you saw, before you saw Harry stab the white dude, did you hear either Harry or the white dude say anything?
> A. Yes.
> Q. What did you hear?
> A.  The white man said, "I will pay you tomorrow.  I will pay you

7

tomorrow,["] and then.
Q. Did Harry say anything?
A. No.
Q. After you saw the white dude fall down on Gurney Street, did you see Harry again at all?
A. No.
Q. Did you see anyone go over towards where the white dude fell and go through his pockets?
MR. DALY [defense counsel]: Objection.  Leading nature of the question.
THE COURT: I sustain the objection.
THE WITNESS: Yes.
BY MS. SWEENEY:
Q. What did you see anyone do in terms of after the white man fell on the ground?
A. They were digging in his pockets.
Q. Who was?
A. Harry.

(Tr. 11/5/92 at 97-100, 105-06.)  Thus, Marcos testified that he both did and did not see Medina after he stabbed Bogan, that he both did and did not hear Bogan say something before Medina stabbed Bogan, and that he both did and did not see someone go over to Bogan after he fell down.

On cross-examination, Marcos contradicted his answers from direct examination and confirmed his preliminary hearing testimony that he did not actually see Medina stab Bogan:

BY MR DALY [defense counsel]:
Q. Do you remember this question: "In fact, you didn't see Harry [Medina] stab the guy [Bogan]. Did you?" Do you remember that question?
A. Yes.
Q. Your answer: "My brother did." Do you remember that answer?
A. Yes.
Q. Do you remember this question: "Your brother did and you were only telling us what your brother told you. Is that right?" And your answer: "Yes." The answer is "Huh-huh."
A. Yes.
Q. Do you remember that question and that answer?

8

A. Yes.

Q. Do you remember this question: "And you didn't eyewitness Harry do anything. Right? Am I correct? You have to say yes or no." And your answer: "Yes."

A. Yes.

Q. Question: "And you only assumed that because you saw the knife at the restaurant. Is that right?"

A. Yes.

Q. And you answered: "Uh-uh." And then to this question: "So everything you said about Harry stabbing the white dude is either something that your brother told you or you made up because you figured he did it because he had a knife. Right?"

A. Yes.

THE COURT: Do you remember that question?

THE WITNESS: Yes.

BY MR. DALY:

Q. And do you remember the answer "Yes"?

A. Yes.

Q. And you were under oath at that time. Were you not?

A. No.

Q. Didn't you raise you hand and put your hand on the Bible before you testified?

A. Yes.

. . .

Q. When the defense attorney [at the preliminary hearing] asked you that question, remember we went over here, when he asked you, "You only assumed that because you saw the knife in the restaurant is that right?"

A. Yes.

Q. And when he asked you the question, "Everything you said about Harry stabbing the white dude is either something that your brother told you or you made up because you figured he did it because he had a knife. Right?"

A. Yes.

Q. When he asked you that question, you were telling the truth. Weren't you?

A. Yes.

Q. And it is not your intention, never was, to tell a lie. Was it?

A. No.

Q. And you believed at the time you were talking to the police that you were helping them?

A. Yes.

Q. Yes?

9

A. Yes.
A. And what you told the defense attorney at the time was the
truth.  Wasn't it?
A. Yes.
Q. You thought from seeing the knife earlier that Harry must have
down [sic] it?
A. Yes.
A. As you told the defense attorney, in fact, you didn't see it.  Did
you?
A. Yes.

(Tr. 11/5/92 at 110-11, 125-26.)  Thus, Marcos repeatedly confirmed the truth of his preliminary

hearing testimony that he did not see Medina stab Bogan.

On redirect examination, the prosecution asked Marcos to confirm portions of his

preliminary hearing testimony indicating that he did see Medina stab Bogan:

Q.  And then the next question, "And did Harry do anything to the
white dude?"  And you said, "No, he only stabbed him once."  Do
you remember that?
A.  Yes.
Q.  Then the next question: "He only stabbed him once.  Now did
you see this with your own eyes?"  And do you remember her
asking that and you saying yes.  Do you remember saying that?
A.  Yes.
Q.  Is that the truth?
A.  Yes.

(Tr.  11/5/92 at 134.)

However, upon re-cross by defense counsel, Marcos once again confirmed the truth of his

preliminary hearing testimony that he did not see Medina stab Bogan:

Q.  When I asked you the question, so everything you said about
Harry stabbing the white dude is either something that your brother
told you or you made up because you figured he did it because he
had a knife – right –
A.  Yes.
Q.  – they [Medina's family] weren't in the room to scare you then.
Were they?

10

A.  No.
Q.  And you were telling the truth to me.  Weren't you?
A.  Yes.

(Tr. 11/5/92 at 136.)

Finally, Marcos's testimony ended with a second redirect examination as follows:

Q. Did you make this up?
A. No.
Q. Did you see this stabbing?
A. Yes.
Q. Who stabbed the white dude?
A. Harry.

(Tr. 11/5/92 at 136-37.)


## II.  PROCEDURAL HISTORY

On November 12, 1992, a jury found Medina guilty of first degree murder, robbery and

possession of instruments of crime.  Medina I at 1.   The prosecutor sought the death penalty.

After the jury deadlocked during the penalty stage, Judge Stout sentenced Medina to life

imprisonment.  (7/27/94 Post-trial opinion of J. Stout at 1.)  At trial, Medina was represented by

Ed Daly, Esq. ("Daly").[3]

Medina filed a direct appeal claiming (1) the trial court erred in permitting the testimony

of two-pre-teenage boys, (2) trial counsel was ineffective for failing to seek a pre-trial

determination of the boys' competency to testify and for failing to object to their competency

_____

[3]Medina was represented by different counsel at each stage of his case.  Attorney Robert
Silverstein represented Medina at the preliminary hearing, attorney Daly represented Medina at
trial, attorney Patrick Egan represented Medina on his first direct appeal, attorney Barnaby
Wittels represented Medina on his second direct appeal, attorney Sondra Rodrigues represented
Medina on his PCRA petition, and attorney Dan Rendine represented Medina on his PCRA
appeal.

during trial, and (3) the evidence was insufficient to support the verdict.  Medina I at 1.  The

Pennsylvania Superior Court found that there was sufficient evidence to support the verdict.  Id.

at 19.  It also found that there was "at least arguable merit to appellant's contention that his trial

counsel was ineffective for failing to object to the competency of the juvenile, Michael [Marcos]

Toro."  Id. at 20.  After a detailed review of Marcos's trial testimony, the court described his

testimony thus:

> It is apparent from this [testimony] that whether the juvenile
> witness observed appellant [Medina] stab the victim depended on
> the identity of the questioner, with whom the young witness
> invariably sought to agree.
> . . .
> The testimony of Michael [Marcos] Toro varied from one extreme
> to the other, depending upon the party asking him questions.
> During the three times that he was questioned by the
> Commonwealth, he testified that he had seen appellant [Medina]
> stab Bogan.  However, he contradicted this testimony during both
> cross and re-cross examination.  On those occasions, he said he had
> not seen appellant stab the victim.  The discrepancy resulted not
> only from defense counsel's impeachment of Michael with his
> preliminary hearing testimony, but also from Michael's testimony
> at trial.  Michael asserted that at the preliminary hearing he
> truthfully had denied that he had seen the stabbing.  He in essence
> provided two distinct accounts of what he actually had seen on the
> night of the stabbing.

Id. at 15, 19.

The Superior Court then found that the matter of Marcos Toro's competency was not

resolved at trial:

> Michael's age necessitated an inquiry into his competency as a
> witness. That inquiry, focused as it was on his consciousness of the
> duty to speak the truth, failed to resolve the matter. His reluctance
> to answer questions had frustrated the trial court and the
> Commonwealth's efforts. Despite that result, the trial court
> permitted him to testify.  During his testimony, he consistently

12

> answered questions as he believed his examiner desired.  His
> inclination to please his questioner created a highly contradictory
> record, where he both saw and did not see the stabbing.  From the
> portions quoted in the trial transcript, Michael had acted in a
> similar fashion at the preliminary hearing.  Nevertheless,
> appellant's trial counsel failed to object to his competency at trial.
> We cannot determine from the record whether a reasonable basis
> existed for this approach by appellant's trial counsel.  With
> Michael as the only eyewitness to the stabbing, and the prejudice
> from his testimony being self-evident, the issue is significant.

Id. at 21-22.  On this basis, the Pennsylvania Superior Court vacated Medina's sentence and

remanded the case for an evidentiary hearing regarding counsel's failure to challenge the

competency of Marcos Toro, the only eyewitness to the stabbing.  Id. at 22-24.

Judge Stout presided over the ineffective assistance of counsel ("IAC") hearing on

November 22, 1995.  Medina was represented by new counsel, Patrick Egan, Esq.  At the

evidentiary hearing, Daly, Medina's trial counsel, explained why he did not object to Marcos

Toro's competency and what his strategy was at trial.  Daly testified that he believed Marcos was

competent based solely on the transcript of the preliminary hearing (as Daly was not Medina's

counsel at the time of the preliminary hearing) and on Marcos's demeanor during trial:

> Well, I looked at the preliminary hearing notes, and based on the
> statements and the conflicts in the statements that I saw there – in
> other words, I ran down the criteria that one considers in looking at
> the competency of a witness. . . .  Well, the individual, did he
> perceive something; yes, he saw something that was there; did he
> recall it; he could recall it; did he have the necessary
> communicative skills; yes, he did; was there any question, did it
> appear that he understood the oath that he was taking; yes, he
> appeared to understand the oath. . . .  [I]t appeared, from the
> preliminary hearing notes, that he was competent, and it appeared,
> when I watched him on the stand, and I watched the demeanor and
> I listened to him, that he had the communicative skills, that he had
> the recollections, that he had, in fact, seen something.

13

(Tr. 11/22/95 at 18, 24.)

When asked about his strategy at trial, Daly testified:

> Well, I decided that the individual appeared to me to be competent,
> and based on the strategy that I wished to use, that is the fact that
> Michael Toro, in his preliminary hearing notes, seemed to flip-flop,
> I wanted to have him on the stand to see whether or not he would
> do the same, which I believed that he, based on the notes of
> testimony, that he would, and he flip-flopped in front of the jury at
> that time. . . .  During the trial, the strategy appeared to work,
> because Michael Toro, in fact, when the prosecution, that is
> yourself, asked Michael Toro a question, he went with the
> prosecution.  However, when I went up and cross-examined him,
> he went for the defense, that is, he didn't see what he supposedly
> saw.

(Tr. 11/22/95 at 18-19.)

Judge Stout did not make a ruling as to Medina's claim at the time of the evidentiary

hearing on ineffective assistance of counsel.  At a subsequent hearing on March 18, 1996, Judge

Stout stated that she prepared a written opinion finding no ineffective assistance of counsel.  (Tr.

3/16/96 at 2.)  However, there is no such opinion by Judge Stout in the state court record, and the

court did not enter an order on that day.  After Judge Stout's death, the Honorable Legrome

Davis of the Philadelphia Court of Common Pleas[4] issued an order on October 10, 1997 denying

Medina's ineffective assistance of counsel claim.

Medina filed a second direct appeal[5] claiming once again that trial counsel was ineffective

---

[4]Judge Davis is now a federal district court judge in the Eastern District of Pennsylvania.

[5]Despite Medina's instructions, attorney Egan failed to file an appeal.  Commonwealth v.
Medina, CP 91-12-1080 at 2 (First Judicial Dist. of Pa., Ct. of Common Pleas, Feb. 8, 2000)
(Lazarus, J.).  Medina filed his own notice of appeal on October 30, 1997, but the notice was
never docketed by the clerk of court.  (Id.)  On June 8, 1998, Medina filed a Petition for Writ of
Mandamus in the Pennsylvania Supreme Court.  (Id.)  The petition was forwarded to the Court of
Common Pleas where it was docketed as a Petition for Post Conviction Relief.  Attorney

for failing to challenge the competency of the Toro brothers.  On February 16, 2001, the Superior Court affirmed the trial court's ruling that trial counsel was not ineffective.  Commonwealth v. Medina, 3132 EDA 1999 (Pa. Super. Ct. Feb. 16, 2001) (hereinafter "Medina II").  The court found that "[c]ounsel's strategy, while arguably the wrong one in hindsight, was not lacking in a reasonable basis designed to further appellant's interest."  Id. at 3.

On or about December 11, 2001, Medina filed a pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9551.  In the amended petition filed by appointed counsel Sondra Rodrigues, Esq., Medina presented three claims: (1) appellate counsel was ineffective for failing to properly preserve the issue of trial counsel's ineffectiveness for failing to present medical evidence establishing that Medina was physically incapable of the activities described at trial; (2) appellate counsel was ineffective for failing to properly preserve the claim that the prosecutor made improper remarks at trial; and (3) appellate counsel was ineffective for failing to properly preserve an argument that the trial court rendered trial counsel ineffective by admonishing him in front of the jury.  (Pet'r's Obj. to R&R Ex. A at 5.)  The PCRA trial court denied Medina's petition on September 27, 2002. Commonwealth v. Medina, 3224 EDA 2002 at 4-5 (Pa. Super. Ct. Sep. 17, 2003) (hereinafter "Medina III").

Medina appealed the denial of his PCRA petition and was appointed new counsel, Dan Rendine, Esq.  On September 17, 2003, the Pennsylvania Superior Court affirmed the trial court's denial.  Medina III at 11.  The court found that Medina had waived his second and third

───────────────

Barnaby Wittels was appointed to represent Medina at that time.  (Id.)  On October 18, 1999, upon agreement by the Commonwealth, Judge Lazarus reinstated Medina's appellate rights.  (Id.)

15

claims because Medina failed to "properly layer" his allegations of IAC. Id. at 7. Pennsylvania law at that time required Medina to raise IAC claims on the first occasion at which he was represented by new counsel, otherwise the issue was considered waived. Id. at 6. To avoid a waiver, a PCRA petitioner had to "layer" his allegations of ineffectiveness to include all prior counsel and state his allegations with specificity. Id. The Superior Court found that Medina's arguments in support of his second and third claims failed to clearly specify which of the two appellate attorneys, Egan or Wittels, Medina was referring to when he made his allegations of ineffectiveness. Id. at 7. As for Medina's first PCRA claim regarding his medical evidence, the court found this claim to be meritless because Medina failed to show how his medical records from five months before the night of the murder were relevant to his physical condition on the night of the murder. Id. at 8-10. Medina filed a petition for allowance of appeal on September 30, 2003, which was denied on December 16, 2003. Commonwealth v. Medina, 468 EAL 2003.

On January 13, 2004, Medina filed, pro se, the instant petition for habeas corpus relief. Medina raises six claims in his petition. Medina's first three claims all allege ineffective assistance of trial counsel for failing to object to the competency of the Toro brothers. Medina's fourth claim alleges ineffective assistance of trial counsel for failing to introduce medical evidence establishing that Medina was incapable of acting in the manner described at trial. Medina's fifth claim alleges that the trial court rendered his trial counsel ineffective by admonishing counsel in front of the jury and that appellate counsel was ineffective for failing to raise this issue. Finally, Medina's sixth claim contends that the prosecution made improper remarks in its closing argument by vouching for the Commonwealth's witnesses and that

16

appellate counsel was ineffective for failing to raise this issue.[6]

I appointed counsel on April 22, 2004.  After supplemental briefing, Magistrate Judge

Jacob P. Hart issued a Report and Recommendation ("R&R") on January 13, 2005, which

recommended granting habeas relief on the basis of Medina's claim that trial counsel was

ineffective for failing to object to the competency of Marcos Toro.  (R&R at 6-22.)  Judge Hart

also found that Medina's fourth claim, that trial counsel was ineffective for failing to introduce

medical records, was without merit (R&R at 22) and that Medina's fifth and sixth claims were

procedurally defaulted (R&R at 5-6).

Both parties filed objections to the R&R.  Medina objected to Judge Hart's finding that

Medina's sixth claim, alleging ineffective assistance of counsel in relation to improper

_____

[6]The distinction among Medina's first three claims is unclear from his pro se habeas
petition.  Medina's appointed counsel first characterized Medina's petition as containing five
claims in the Supplemental Memorandum of Law in Support of Medina's Habeas Petition: (1)
ineffective assistance of trial counsel for failing to object to the competency of the Toro brothers;
(2) violation of Medina's federal due process rights when the trial court failed to conduct a sua
sponte inquiry into the competency of the Toro brothers; (3) ineffective assistance of trial counsel
for failing to introduce medical records; (4) ineffective assistance of counsel for failing to object
to improper prosecutorial remarks; and (5) ineffective assistance of trial and appellate counsel in
relation to the trial court's admonishments of trial counsel in front of the jury.  (Supp. Mem. Law
Supp. Habeas Pet. at 1 n.1.)  However, Judge Hart characterized Medina's pro se habeas petition
as containing six claims, the first three of which are essentially one claim of ineffective
assistance of trial counsel for failing to object to the Toro brothers' competency to testify.
(Report and Recommendation ("R&R") at 4.)  The parties did not object to this characterization
of Medina's claims in their objections, and Medina actually adopted this characterization of his
claims in his objections to the R&R.  (Pet.'s Obj. at 3-4.)

This characterization of Medina's petition disregards his pro se claim that the trial court
violated his due process rights when it failed to conduct a sua sponte inquiry into the competency
of the Toro brothers.  However, in light of my granting habeas relief on the basis of Medina's
claim of ineffective assistance of trial counsel for failing to object to Marcos Toro's competency,
it is not necessary to discuss whether the trial court should have conducted a competency hearing
sua sponte.  Therefore, I will address petitioner's claims as they are characterized in the R&R and
in the parties' objections.

prosecutorial remarks, was procedurally defaulted.  (Pet'r's Obj. to R&R.)  Respondents objected

to Judge Hart's conclusion that Medina's trial counsel was ineffective for failing to object to the

competency of Marcos Toro.  (Resp'ts' Obj. to R&R.)  Neither party objected to Judge Hart's

findings on Medina's fourth and fifth claims.

Oral argument was held on April 29, 2005, and both parties filed post-argument briefs.

For the reasons set forth below, I will affirm the conclusion reached in Judge Hart's R&R and

grant Medina's petition for habeas relief.


## III.  STANDARD OF REVIEW

This petition is governed by the revisions to the federal habeas statute enacted in the Anti-

Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, 110 Stat. 1214 (1996),

effective April 24, 1996 ("AEDPA").  Pursuant to AEDPA,

> when a federal court reviews a state court's ruling on federal law,
> or its application of federal law to a particular set of facts, the state
> court's decision must stand unless it is "contrary to, or an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States."

Lam v. Kelchner, 304 F.3d 256, 263 (3d Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)).[7]

A state court decision is "contrary" to clearly established Supreme Court precedent "if the

state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,"

---

[7]Federal habeas relief is also available if the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  This clause is not at issue in the instant case because Medina does not contend that the state court's decision was based on an unreasonable determination of the facts.  Rather, Medina only argues that the state court's decision was an unreasonable application of clearly established federal law.

or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court

and nevertheless arrives at a result different from our precedent."  Williams v. Taylor, 529 U.S.

362, 405-06 (2000), quoted in  Lam, 304 F.3d at 263.  Under the "unreasonable application"

clause, habeas relief should be granted "when the state court 'correctly identifies the governing

legal rule but applies it unreasonably to the facts of a particular [] case.'"  Id. (quoting Williams,

529 U.S. at 407-08).  Furthermore, with respect to this clause, habeas relief will only be

warranted if the "state court's application of clearly established federal law was objectively

unreasonable," not merely "incorrect."  Williams, 529 U.S. at 409-410, quoted in  Lam, 304 F.3d

at 263.


## IV.  DISCUSSION

### A.  Ineffective Assistance of Counsel for Failing to Object to Marcos Toro's Competency

Medina claims that his trial counsel, Daly, was ineffective for failing to object to the

competency of Marcos Toro as a witness.[8]  To merit habeas relief, Medina must show that the

Pennsylvania state court's decision denying his claim was an unreasonable application of clearly

established federal law.  Williams, 529 U.S. at 413.  The clearly established federal law that

governs Medina's ineffective assistance of counsel ("IAC") claim is found in Strickland v.

Washington.  466 U.S. 668 (1984).  To prove IAC under Strickland, a petitioner must show that

(1) trial counsel's performance was deficient, and (2) that the deficiency prejudiced petitioner's

---

[8]Although Medina's pro se habeas petition included Hector Toro in this claim, Medina's counseled supplemental brief only addressed the testimony of Marcos Toro.  The R&R found no basis to question Hector's competency to testify (R&R at 6), and Medina did not object to Judge Hart's finding as to Hector's competency.  Therefore, I will adopt Judge Hart's finding as to the competency of Hector Toro and focus solely on the testimony of Marcos Toro in this claim.

defense.  466 U.S. at 687.  To find that the state court's application of <u>Strickland</u> was "unreasonable," the state court's decision must have been more than simply incorrect or erroneous.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003).  The state court's application of <u>Strickland</u> must have been "objectively unreasonable." <u>Id.</u>

The state court decision under review is the Pennsylvania Superior Court's second direct appeal decision in Medina's case, <u>Medina II</u>.  I will first analyze whether <u>Medina II</u>'s application of the first prong of <u>Strickland</u> was an objectively unreasonable application of clearly established federal law and then address the prejudice prong of <u>Strickland</u> under the standard of <u>de novo</u> review.[9]

### 1. <u>Medina II</u>'s application of the first prong of Strickland

In determining whether <u>Medina II</u>'s denial of Medina's IAC claim constituted an unreasonable application of clearly established federal law, the first step is to set forth the applicable federal law, that is, the first prong of <u>Strickland</u>; then analyze Daly's performance under the <u>Strickland</u> standard; lastly review whether the state court's application of <u>Strickland</u> to Daly's performance was an unreasonable application of the <u>Strickland</u> standard.  I conclude that <u>Medina II</u> constituted an unreasonable application of clearly established federal law.

To establish deficient performance under the first prong of <u>Strickland</u>, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."

---

[9]<u>Medina II</u> concluded that the performance of Medina's trial counsel, Daly, was not deficient and, therefore, never reached the prejudice prong of <u>Strickland</u>.  Because <u>Medina II</u> never reached the prejudice prong of the <u>Strickland</u> analysis, nor did any other state court, my review of the prejudice prong of <u>Strickland</u> is a <u>de novo</u> review rather than a deferential review under the "unreasonable application" clause of AEDPA.  <u>Wiggins</u>, 539 U.S. at 534.

Strickland, 466 U.S. at 688; Wiggins, 539 U.S. at 521.  The proper measure of attorney

performance "remains simply reasonableness under prevailing professional norms."  Id.  The

reasonableness of counsel's conduct must be determined on the facts of the particular case,

viewed as of the time of counsel's conduct and "in light of all the circumstances."[10]  Strickland,

466 U.S. at 689-90.  "Judicial scrutiny of counsel's performance must be highly deferential" and

"strategic choices made after thorough investigation of law and facts relevant to plausible options

are virtually unchallengeable."[11]  Id. at 690.

---

[10]In Jacobs v. Horn, 395 F.3d 92, 106 (3d Cir. 2005), the Third Circuit decided that the state court's "decision, based on a single factor to the exclusion of other relevant factors, involved an unreasonable application of Strickland."  The Third Circuit noted that cases have often emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances.  Id. at 106-07 (citing Wiggins, 539 U.S. at 533; Roe v. Flores-Ortega, 528 U.S. 470, 478 (2000); Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); Lewis v. Johnson, 359 F.3d 646, 659 (3d Cir. 2004); Rompilla v. Horn, 355 F.3d 233, 257 (3d Cir. 2004); Duncan v. Morton, 256 F.3d 189, 201 (3d Cir. 2001); Berryman v. Morton, 100 F.3d 1089, 1101 (3d Cir. 1996); Frey v. Fulcomer, 974 F.2d 348, 358 (3d Cir. 1992).

[11]While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  466 U.S. at 690-91; Wiggins, 539 U.S. at 521.  In Wiggins, 539 U.S. 510, in which the United States Supreme Court addressed an IAC claim, trial counsel justified their limited investigation into petitioner's background "as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead."  Id. at 521.  The Court rejected trial counsel's proffered strategy.  The Supreme Court found that the state court unreasonably applied Strickland because it failed to examine whether counsel's decision was based on a reasonable investigation, including whether the scope of that investigation was reasonable.  Id. at 527-29.
      Although Wiggins and Strickland were both decided in the context of counsel's failure to adequately investigate facts relevant to mitigation in death penalty cases, the Supreme Court clearly contemplates counsel's duty to investigate the applicable law as well as the relevant facts.  Only strategic decisions "made after thorough investigation of law and facts relevant to plausible options" are virtually unchallengeable.  466 U.S. at 690-91; Wiggins, 539 U.S. at 521.  Wiggins shows that a court cannot accept as sound trial strategy just any proffered justification by trial counsel.  Rather, a court must consider if counsel's strategy was based on a reasonable investigation into relevant facts and law.  A knowledge of the applicable law is a necessary first

The reasonableness of counsel's conduct must be analyzed in light of the applicable law at the time of trial.  Everett v. Beard, 290 F.3d 500, 509 (3d Cir. 2002) ("Of course, the state of the law is central to an evaluation of counsel's performance at trial.  A reasonably competent attorney patently is required to know the state of the applicable law. . .").[12]  Medina's IAC claim involves Daly's failure to object to the testimony of Marcos Toro based on his competency.  Witness competency is a question governed entirely by state law.  In this case, as in Everett, the analysis of the federal constitutional claim, that of ineffective assistance of counsel, obviously involves an analysis of the state law.[13]  The reasonableness of Daly's failure to object to Marcos Toro's testimony must be assessed in light of Pennsylvania state law on witness competency.

Under Pennsylvania law, a witness is competent to testify if the witness:

> "(1) has the capacity to observe or perceive the occurrence with a substantial degree of accuracy; (2) has the ability to remember the event which was observed or perceived; (3) has the ability to understand questions and to communicate intelligent answers about the occurrence; and (4) has a consciousness of the duty to speak the truth."

Commonwealth v. Mazzoccoli, 380 A.2d 786, 787 (Pa. 1977).[14]  While adult witnesses are

---

step into determining what relevant facts might be.

[12]While certain holdings in Everett are no longer binding, see Priester v. Vaughn, 382 F.3d 394, 397-98 (3d Cir. 2004), Everett's ineffective assistance of counsel analysis is still valid.

[13]In Everett, the Third Circuit reviewed applicable Pennsylvania law on accomplice liability for first-degree murder because such a review was necessary in determining whether counsel was ineffective for failing to object to jury instructions on accomplice liability.  290 F.3d at 510-11 In Jacobs, the Third Circuit looked to Pennsylvania law on a diminished capacity defense in order to determine whether counsel was ineffective for failing to raise such a defense. 395 F.3d at102.

[14]Pennsylvania courts have alternatively articulated this same standard as a three-prong test requiring "(1) such capacity to communicate, including as it does both an ability to

assumed to be competent, when the witness is under 14 years of age, "there must be a searching

judicial inquiry as to mental capacity."  <u>Commonwealth v. Fultz</u>, 462 A.2d 1340, 1343 (Pa.

Super. Ct. 1983).  This is because:

> The capacity of young children to testify has always been a concern
> as their immaturity can impact their ability to meet the minimal
> legal requirements of competency.  Common experience informs
> us that children are, by their very essence, fanciful creatures who
> have difficulty distinguishing fantasy from reality; who when asked
> a question want to give the "right" answer, the answer that pleases
> the interrogator; who are subject to repeat ideas placed in their
> heads by others; and who have limited capacity for accurate
> memory.

<u>Commonwealth v. Delbridge</u>, 855 A.2d 27, 39-40 (Pa. 2003).  The determination of competency

is vested in the discretion of the trial court and is reviewed only for abuse of discretion.

<u>Mazzoccoli</u>, 380 A.2d at 787.

   At the time of Medina's trial, the Pennsylvania Supreme Court had already set forth an

example of an incompetent child witness.  In <u>Mazzaccoli</u>, the Pennsylvania Supreme Court held

that the trial court abused its discretion in finding a 15-year-old competent to testify.  380 A.2d

786.  When the 15-year-old witness in <u>Mazzaccoli</u> was asked "And do you know whether it is

right or wrong to tell a lie?  Do you?" the witness answered, "No."  <u>Id.</u> at 788.  Additionally,

when the witness was asked "Is it right or wrong to tell a lie?" the witness answered, "Right."  <u>Id.</u>

The court concluded from this testimony that the witness "did not demonstrate a consciousness

of the duty to tell the truth."  <u>Id.</u>  The <u>Mazzaccoli</u> court also found that the witness did not have

---

understand questions and to frame and express intelligent answers, (2) mental capacity to observe
the occurrence itself and the capacity to remember what it is that she is called to testify about and
(3) a consciousness of the duty to speak the truth. . . ."  <u>Rosche v. McCoy</u>, 155 A.2d 307, 310
(Pa. 1959).

23

the ability to understand questions and communicate intelligent answers:

> Most [of the witness's] answers were simply yes or no responses to
> leading questions.  The entire transcript reveals that most of the
> time [the witness's] answers could be manipulated by the question.
> Further, this entire testimony is fraught with inconsistencies and
> contradiction.

Id.  The Mazzaccoli court concluded, "Under these circumstances, we believe that the trial court

abused its discretion in allowing [the witness] to testify."  Id.

At the time of Medina's trial, applicable state law also held that an objectively reasonable

attorney would not merely rely on cross-examining a key witness when the attorney could also

make an arguably meritorious competency challenge.  In Commonwealth v. Mangini, 425 A.2d

734 (Pa. 1981), the Pennsylvania Supreme Court rejected the lower court's finding that trial

counsel was reasonable in attempting to discredit a witness on cross-examination rather than

challenging the witness's competency.  The "key prosecution witness" in Mangini was a

paranoid-schizophrenic.  The state Supreme Court, quoting extensively from the lower court

decision, noted that "even if counsel's tactic was deliberate, it was ineffective to effectuate his

client's interest":

> Initially, it must be noted that an objection to the
> competency of the witness would at least have been of arguable
> merit under prior competency cases of the Supreme Court.
> Counsel could have raised this objection, or requested a
> competency hearing, without prejudice to his ability to pursue his
> other alternative, i.e. attempting to discredit the witness on cross.
> This was not a case where counsel had two alternatives that
> were mutually exclusive.  In such a case, counsel must necessarily
> choose one or the other alternative.  This case presents, instead, the
> situation where counsel has two alternatives,[15] both of which are

---

[15]  The Pennsylvania Supreme Court noted that "while the Superior Court sometimes
referred to counsel's 'alternatives,' the two strategies examined were not 'alternatives' at all.

> available to him.  Counsel could have attempted to (first) disqualify the witness. . . .  If he succeeded in this attempt, there would be no need to pursue the less certain method of discrediting the witness on cross.  If he failed in the attempt, he still could fall back on cross-examination. . . .  There is no reasonable basis under these circumstances[] for[] deliberately eschewing one weapon (out of two available) when both can be used.

425 A.2d at 737 (internal citations omitted).  In <u>Commonwealth v. Fultz</u>, 462 A.2d 1340, 1345-46 (Pa. Super. Ct. 1983), the Pennsylvania Superior Court later applied <u>Mangini</u> to a case in which defense counsel failed to challenge the competency of a child witness and, after quoting extensively from <u>Mangini</u>, found that defense counsel had no reasonable basis for failing to request a competency hearing or for failing to place on the record an objection to the minor's competency.

In light of the applicable law on the competency of juvenile witnesses and the specific facts in Medina's case, all of which are relevant to assessing the reasonableness of Daly's actions "under the prevailing professional norms" and "in light of all the circumstances" as required by <u>Strickland</u>, Daly's performance fell below an objective standard of reasonableness.  Several individual circumstances in Medina's case would have caused a reasonably competent attorney to object to the competency of Marcos Toro, a juvenile who was the prosecution's sole eyewitness.  The sum of these circumstances makes it overwhelmingly apparent that Daly fell below an objective standard of reasonableness in failing to do so.

First of all, Marcos's age alone should have prompted Daly to request a competency hearing.  Marcos was 12 years old at the time of trial.  (Tr. 11/5/92 at 83.)  For any witness under the age of 14, there must be a "searching judicial inquiry as to mental competency."  <u>Fultz</u>, 462

---

Rather, they were distinct and independent tactics."  425 A.2d at 737 n.4.

A.2d at 1343.  As the state Superior Court noted on Medina's first direct appeal, the inquiry at

trial "failed to resolve this matter."  Medina I at 21.  Because Marcos was under the age of 14 and

because the trial court failed to conduct a searching inquiry as to Marcos's mental competency,

as required by Pennsylvania law, Daly should have objected to Marcos's testimony or requested a

full competency hearing.

Second, Daly should have requested a competency hearing on the basis of Marcos's

preliminary hearing testimony, which contained sufficient contradictions and inconsistencies that

it called into question Marcos's competency.  The most significant contradiction in Marcos's

testimony was whether he actually witnessed Medina stab Bogan.  At certain points in the

preliminary hearing, Marcos indicated that he was merely relating what his brother told him had

happened or what he guessed had happened.  On direct examination during the preliminary

hearing, Marcos testified:

> Q: What did you see Harry [Medina] do with the white dude
> [Bogan]?
> A: Stabbed him.

(Tr. 11/26/91 at 9.)  But on cross-examination, Marcos testified:

> Q: In fact, you didn't see Harry stab the guy, did you?
> A: My brother did.
> Q: Your brother did.  And you are only telling us what your brother
> told you; is that right?
> A: A-huh

(Id. at 23.) Marcos's preliminary hearing testimony was also inconsistent as to whether he saw

Bogan before or after Bogan was stabbed;[16] when Marcos first saw Medina in the presence of

_____

[16]Marcos testified that when he first saw Bogan, Bogan was holding his heart, suggesting
that Bogan had already been stabbed:
        Direct

Bogan;[17] and whether Marcos's brother, Hector, was with Marcos when he saw Bogan.[18]  The

---

> Q: Tell the Judge what you saw when you looked out your
> window?
> A: The dude [Bogan] with his hand on his heart.

(Tr. 11/26/91 at 8.)  Marcos then testified during cross-examination that he did not see anything before he saw Bogan through the window.  Given that Bogan died of single stab wound to the heart, this was tantamount to Marcos testifying that he did not see the stabbing:

> Cross
> Q: Now, you said you looked out the window and you saw this
> white gentleman [Bogan] holding his heart; is that correct?
> A: Yes.
> Q: Did you see anything before that?
> A: **No.**

(Id. at 20) (emphasis added).

[17]On direct examination, Marcos testified that when he looked out his window, he saw Medina with Bogan:

> Direct
> Q: Did you see Harry [Medina] when you were looking out your
> window?
>     MR. SILVERSTEIN: Objection, leading nature.
>     THE COURT: Overruled
> [By Prosecutor]
> Q: You can answer?
> A: **Yes.**
> Q: Okay.  And what was Harry doing?
> A: Chasing him.

(Tr. 11/26/91 at 9) (emphasis added).  However, on cross and redirect, Marcos testified that he did NOT see Medina with Bogan when he looked out the window:

> Cross:
> Q: Did you see Harry when this white fellow was running down the
> street holding his heart?
> A: **No.**
> Q: You did not see Harry?
> A: **No.**

(Id. at 21) (emphasis added).

> Redirect
> Q: When you looked out your window, did you see the white dude
> at that time?
> A: Yes.
> Q: And did you see Harry at that time?
> A: **No.**

Pennsylvania Superior Court in Medina's first direct appeal, <u>Medina I</u>, noted that Marcos's preliminary hearing testimony was contradictory.  <u>Medina I</u> at 21 ("[Marcos's] inclination to please his questioner created a highly contradictory record, where he both saw and did not see the stabbing.  From the portions quoted in the trial transcript, [Marcos] had acted in a similar fashion at the preliminary hearing.").  Daly himself characterized Marcos's preliminary hearing testimony as "flip-flopping."  (Tr. 11/22/95 at 18-19.)  It is apparent from the face of the preliminary hearing transcript that Marcos's testimony was full of contradictions and inconsistencies.  These contradictions went directly to Marcos's ability to perceive the events in question, his ability to remember the events, and his ability to understand questions and communicate answers intelligently, three of the four factors that Pennsylvania courts must consider in assessing the competency of a juvenile witness.  <u>Mazzoccoli</u>, 380 A.2d at 787.  A reasonably competent attorney would have requested a competency hearing after reading the transcript of Marcos's preliminary hearing testimony.

Daly had yet a third indication that Marcos's competency was highly questionable.  Like

---

           Q: Okay.  Did you see Harry after that?
           A: **No.**
(<u>Id.</u> at 28) (emphasis added).

[18]Within the space of three questions, Marcos changed his answer to a straightforward question:
           <u>Re-cross:</u>
           Q: Was your brother looking out the window with you?
           A: No.
           Q: When you saw Harry [Medina] stab the white gentleman
           [Bogan]?
           A: No.
           Q: Was he?
           A: Yes.
(Tr. 11/26/91 at 33.)

the 15-year-old witness in <u>Mazzaccoli</u>, 12-year-old Marcos Toro failed to demonstrate a

consciousness of the duty to speak the truth, one of the requirements of competency.  At trial,

Marcos testified as follows:

> Q. [By the prosecution]  Do you know what it means to tell the
> truth?
> A. [By Marcos Toro]  Yes.
> Q. What does it mean?
> A. (No response.)
> Q. Let me ask it the other way. **Do you know what it means to
> tell a lie?**
> A. **No.**
> Q. **Do you know the difference between telling the truth and
> telling a lie?**
> A. **No.**
> Q. You just told the jury and the judge when you put your hand on
> the Bible you were going to tell the truth?
> A. Truth.
> Q. What does the truth mean?
> THE COURT: First of all, let's sit up straight and take our hand
> down. What happens to you if you tell a lie?
> (No response.)
> THE COURT: What happens to you? Take your hand down and
> look at me. Tell me what will happen to you if you tell a lie?
> (No response.)

(Tr. 11/5/92 at 83-84) (emphasis added).[19]  This exchange blatantly called into question Marcos's

consciousness of the duty to speak the truth.  Having failed to make an objection to Marcos's

competency before Marcos began to testify, Daly should have made such an objection upon

---

[19]This section of Marcos's trial testimony cannot be considered a competency hearing
because the trial court did not inquire as to all four requirements of witness competency.  First of
all, the trial court did not test Marcos's ability to perceive or remember events accurately or his
ability to understand questions and communicate answers intelligently.  More importantly, the
state superior court in its first direct appeal decision found that this exchange failed to resolve the
issue of Marcos's competency.  <u>Medina I</u> at 21 ("Michael's [Marcos's] age necessitated an
inquiry into his competency as a witness. That inquiry, focused as it was on his consciousness of
the duty to speak the truth, failed to resolve the matter.").

hearing this exchange at trial.

Furthermore, like his testimony at the preliminary hearing, Marcos's trial testimony as to what he saw was so contradictory that it called into question his ability to perceive the events, remember the events, and to understand questions and communicate intelligent answers about those events.  Like the witness in Mazzaccoli, most of Marcos's answers were "yes" or "no" responses to leading questions,[20] his answers could be manipulated by the question and usually matched the answer desired by his questioner,[21] and his answers were inconsistent and contradictory.[22]  See generally supra section I (containing excerpts of Marcos's direct, cross,

---

[20]Out of the thirty-three answers Marcos gave during his re-direct examination, thirty-one of those answers consisted of only "yes" or "no."  (Tr. 11/5/92 at 127-34.)

[21]Perhaps one of the more obvious examples of Marcos's inclination to please came during the prosecutor's redirect examination at trial when the prosecutor admonished Marcos for answering her question without even listening to it:
> Q. [BY PROSECUTION] And after, you talked about the white dude being stabbed in the heart, and falling on the Street, by Hope Street.  Did you tell the police that night?
> A.  Yes.
> Q. **Wait.  You didn't even hear my question.** . . .

(Tr. 11/5/92 at 128) (emphasis added).

[22]For example, during direct examination, Marcos testified that he did not see anyone approach Bogan after Bogan collapsed on the street:
> Q. [BY PROSECUTION]  After you saw him, meaning the white man [Bogan], fall down on Gurney Street, did you see anybody do anything?
> A. **No.**
> Q. What happened after the white man fell down on Gurney Street?
> A. (Pause.)
> Q. Did you see anyone at all go over to the white man after he fell down?
> A. **No.**

(Tr. 11/5/92 at 98-99) (emphasis added).  However, Marcos contradicted himself when he testified, also during direct examination, that he saw Medina go over to Bogan after Bogan collapsed on the street:

redirect, re-cross and final redirect examinations).  The most significant contradiction in

Marcos's testimony involved whether or not he actually saw Medina stab Bogan.  Marcos first

indicated, indirectly, that he saw Medina stab Bogan:

> BY MS. SWEENEY [prosecution]:
> Q. Marcos, after you went home to your house, what did you see
> happen which is why you came to court today?
> A. (Pause.) Because he stabbed somebody.
> Q. Who stabbed somebody?
> A. Harry [Medina].

(Tr. 11/5/92 at 97.)  However, on cross, Marcos indicated that he did not see Medina stab Bogan:

> Q. When the defense attorney [at the preliminary hearing] asked
> you that question, remember we went over here, when he asked
> you, "You only assumed that because you saw the knife in the
> restaurant is that right?"
> A. Yes.
> Q. And when he asked you the question, "Everything you said
> about Harry stabbing the white dude is either something that your
> brother told you or you made up because you figured he did it
> because he had a knife.  Right?"
> A. Yes.
> Q. When he asked you that question, you were telling the truth.
> Weren't you?

> —————————————

> Q. After you saw the white dude fall down on Gurney Street, did
> you see Harry [Medina] again at all?
> A. **No.**
> Q. Did you see anyone go over towards where the white dude fell
> and go through his pockets?
> MR. DALY: Objection.  Leading nature of the question.
> THE COURT: I sustain the objection.
> THE WITNESS: **Yes.**
> BY MS. SWEENEY:
> Q. What did you see anyone do in terms of after the white man fell
> on the ground?
> A. They were digging in his pockets.
> Q. Who was?
> A. **Harry.**

(Id. at 105-06) (emphasis added).

31

A. Yes.

(Id. at 125.)  The Superior Court in Medina I described Marcos's testimony thus:

> During his testimony, he consistently answered questions as he
> believed his examiner desired.  His inclination to please his
> questioner created a highly contradictory record, where he both
> saw and did not see the stabbing.

Medina I at 21.  This trial testimony, on top of Marcos's age, his contradictory preliminary

hearing testimony, and his ambiguous knowledge of the difference between a truth and a lie,

should have prompted any reasonably competent attorney to object to Marcos's competency as a

witness.[23]

Daly testified at the evidentiary hearing after the Medina I remand that his strategy with

regards to Marcos was to discredit Marcos through cross-examination rather than making a

competency objection.  (Tr. 11/22/95 at 18-19.)  Daly's strategy was objectively unreasonable

because it represented a false choice.  This was not a case where two potential strategies were

mutually exclusive.  Daly could have first attempted to eliminate Marcos's testimony altogether

---

[23]Respondents argue that the contradictions in Marcos's preliminary hearing testimony
were not caused by Marcos's incompetency but by Marcos's fear of Medina's family members,
who were sitting in the audience at the preliminary hearing.  (Resp. to Pet'r's Post-Argument
Letter at 2.)  Respondents then speculate that "it is not beyond the realm of possibility" that
Medina's family engaged in witness intimidation in the time between Marcos's preliminary
hearing testimony and his trial testimony.  (Resp. to Pet'r's Post-Argument Letter at 10.)  There
are no evidentiary findings or affidavits on the record, either inside or outside of the courtroom,
to support this speculation.  Contrary to respondents' intimations in their briefs (Resp'ts' Obj. to
R&R at 5-6; Resp. to Pet'r's Post-Argument Letter at 10 n.3), which cite to an entirely unrelated
article in the New York Times on witness intimidation by Boston street gangs, there is no
evidence that Medina's family members intimidated or even approached Marcos in the time
between the preliminary hearing and the trial.  Regardless of the cause for the contradictory
nature of Marcos's testimony, the combined circumstances of his age, the fact that his testimony
at both the preliminary hearing and trial contradicted itself, and his ambiguous understanding of
the difference between the truth and a lie all would have caused a reasonably competent attorney
to object to Marcos's competency.

by objecting to Marcos's competency.  As set forth above, such an objection had, at the very

least, arguable merit.  If the competency objection failed, Daly could have then pursued his

chosen strategy of discrediting Marcos's testimony through cross-examination.  Any cross-

examination would not have been prejudiced by a prior competency objection.[24]  There is no

reasonable basis under these circumstances for deliberately eschewing one weapon, out of two

available, when both can be used.

Daly's strategy was also objectively unreasonable under prevailing professional norms as

established by the Pennsylvania Supreme Court in Mangini, 425 A.2d 734.  As mentioned

earlier, the Mangini court held that trial counsel was ineffective for attempting to discredit a "key

prosecution" witness on cross-examination rather than challenging the witness's competency

when such a challenge would have been of arguable merit under prior competency cases of the

court.  Id. at 737.  Also, the state Superior Court later applied Mangini to a case in which defense

counsel failed to challenge the competency of a child witness.  Fultz, 462 A.2d 1340.  After

---

[24]Respondents speculate that Daly might have chosen not to object to Marcos's
competency because a finding of competency by the trial court in front of the jury would have
bolstered Marcos's credibility to the jury.  (Suppl. Resp. to Pet. at 6.)  There were enough factors
before trial, however, such as Marcos's age and his contradictory preliminary hearing testimony,
to prompt a reasonably competent attorney to request a pre-trial competency hearing.  Such a pre-
trial hearing would not have been before a jury and could not have prejudiced Daly's cross-
examination at trial.  If Daly had objected to Marcos's competency during Marcos's trial
testimony, Daly could have requested that the trial court hold a hearing on his objection outside
of the presence of the jury.  If the trial court refused and if the trial court overruled the
competency objection, Daly could have requested that the trial court instruct the jury as to the
difference between competency and credibility.  See, generally, Commonwealth v. Washington,
722 A.2d 643, 646 (Pa. 1998) (noting that some jurisdictions require such instructions if
competency examinations are held within the presence of the jury).  All of these options would
have had a reasonable probability of success.  In Washington, decided after Medina's trial, the
Pennsylvania Supreme Court adopted the rule concretely that all hearings on the competency of
juvenile witnesses must be held outside of the presence of the jury.  722 A.2d at 647.

quoting extensively from <u>Mangini</u>, the <u>Fultz</u> court found that defense counsel had no reasonable basis for failing to request a competency hearing or for failing to place on the record an objection to the minor's competency.  <u>Fultz</u>, 462 A.2d at 1345-46.  <u>Mangini</u> can be directly applied to Medina's case.  As in <u>Mangini</u>, Marcos was a key prosecution witness.  As in <u>Mangini</u>, a competency challenge as to Marcos would have been of arguable merit.  As in <u>Mangini</u>, Daly could have requested a competency hearing or raised an objection to Marcos's testimony without prejudicing his ability to discredit Marcos through cross-examination.  Given that Daly's strategy represented a false choice and given that Daly's decision was deficient under the professional standards set by the state Supreme Court in <u>Mangini</u>, Daly's performance plainly fell below an objective standard of reasonableness.

In summary, the first prong of <u>Strickland</u> requires that Daly's performance be measured under an "objective standard of reasonableness."  466 U.S. at 688.  That reasonableness is determined under "prevailing professional norms" and "in light of all the circumstances."  <u>Id.</u> at 688-690.  Determining whether counsel's performance was objectively reasonable necessitates viewing counsel's actions in light of applicable state law since reasonably competent counsel is patently required to know the state of the applicable law.  <u>Everett</u>, 290 F.3d at 509.  In light of the applicable state law on the competency of juvenile witnesses, Marcos's age, his equivocal answers as to whether he knew the difference between a truth and a lie, and his contradictory testimony during both the preliminary hearing and at trial all would have prompted reasonably competent counsel to object to Marcos's competency as a witness.  Daly's decision to discredit Marcos through cross examination rather than to try to disqualify his testimony altogether through a competency challenge, when he could have pursued both options, was objectively

unreasonable in light of prevailing professional norms as set by state Supreme Court law.  In light of all these circumstances, Daly's failure to object to Marcos's competency fell below Strickland's objective standard of reasonableness.

The Pennsylvania Superior Court in Medina II concluded that Daly's performance was not deficient and, therefore, denied Medina's IAC claim.[25]  In concluding that Daly's strategy had a reasonable basis, Medina II focused solely on Daly's own testimony and his rationale.  Medina II at 2-3.  The Medina II court considered Daly's belief that Marcos was competent and Daly's strategy of cross examination.  Id. at 2.  The Medina II court noted that "As the transcript from the evidentiary hearing established, counsel fully explained his strategy in going forward with cross-examination of the witness, rather than challenging his competency."  Id. at 2.  Medina II concluded that Daly's decision, "while arguably the wrong one in hindsight, was not lacking in a reasonable basis designed to further appellant's interest."  Id. at 3.

By focusing solely on Daly's testimony explaining his action, Medina II's application of Strickland was objectively unreasonable.  Medina II failed to take into consideration prevailing professional norms, as embodied in Mangini and Fultz, in assessing the reasonableness of Daly's strategy; the court failed to consider if Daly's strategy was based on a reasonable investigation or

---

[25]Pennsylvania's IAC analysis consists of a three-pronged test: (1) whether the underlying claim is of arguable merit; (2) whether "an objectively reasonable basis designed to effectuate the [defendant's] interest existed for counsel's actions or inactions;" and (3) whether defendant was prejudiced by the alleged error by counsel.  Medina I at 23-24.  Although the Medina II court articulated its finding in terms of the second prong of Pennsylvania's IAC test, the Third Circuit has noted that Pennsylvania's IAC test and the Strickland standard are the same.  Rompilla v. Horn, 355 F.3d 233, 248 (3d Cir. 2004); Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).  In particular, the second prong of the Pennsylvania test, whether an objectively reasonable basis designed to effectuate the defendant's interest existed for counsel's actions or inactions, is "substantially indistinguishable" from the first prong of Strickland.  Rompilla, 355 F.3d at 248.

knowledge of the applicable law governing the competency of juvenile witnesses; and the court failed to assess Daly's actions in light of all the circumstances, including Marcos's age, his contradictory preliminary hearing and trial testimony, and his ambiguous understanding of the difference between the truth and a lie.  All of these are necessary considerations in assessing whether Daly's performance fell below an objective standard of reasonableness under the first prong of Strickland.  Given how egregious Daly's failure to object was in light of all the circumstances of Medina's case, Medina II's conclusion that Daly's performance was not deficient was not merely an incorrect application of Strickland, it was an objectively unreasonable application of clearly established federal law.


*2.  Prejudice* _____

_____Because the state courts never reached the prejudice prong of Strickland, my review of this prong is de novo.  Wiggins, 539 U.S. at 534.  To establish prejudice under Strickland, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Wiggins, 539 U.S. at 534 (quoting Strickland, 466 U.S. at 694) (internal quotations omitted).  A "reasonable probability" is less demanding than a "preponderance of the evidence" standard.  See Jacobs, 395 F.3d at 105 ("[Petitioner] need not show that counsel's deficient performance more likely than not altered the outcome in the case – rather, he must show only a probability sufficient to undermine confidence in the outcome.  This standard is not a stringent one.") (citing Strickland, 466 U.S. at 693-94; Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)).

36

There is a reasonable probability that had Daly objected to Marcos's competency, Marcos would have been found incompetent to testify and, without the testimony of the sole eyewitness, the jury would not have convicted Medina.  For the reasons stated in section IV.A.1., supra, there is at least a reasonable probability that Marcos would have been found incompetent.  Marcos's answers regarding his consciousness of the duty to speak the truth were equivocal.  (Tr. 11/5/92 at 83-84.)  Marcos's contradictory testimony both at the preliminary hearing and at trial called into question his ability to perceive the events, remember them accurately, and understand questions and communicate intelligent answers.  See supra section IV.A.1.  Because Marcos was under the age of 14, the trial court was obligated to conduct a searching inquiry into his mental capacity.  Fultz, 462 A.2d at 1343.  There is a reasonable probability that had Daly actually objected to Marcos's competency and requested a competency hearing, the trial court would have found Marcos incompetent.  For the trial court to do otherwise could well have been an abuse of discretion, as in Mazzaccoli.

Respondents argue that in order to show prejudice, Medina must "demonstrate that, had counsel raised this objection, the trial court would have sustained the objection."  (Resp'ts' Obj. to R&R at 8.)  Respondents go on to argue that Judge Stout's post-trial ruling that the evidence was sufficient to sustain the verdict indicated that she believed Marcos was competent to testify.  (Resp'ts' Obj. to R&R at 8-9.)  Therefore, she would not have sustained an objection to his competency.  (Id.)  Respondents' argument is flawed for at least two reasons.  First, in order to show prejudice under Strickland, a petitioner only has to show a "reasonable probability," a standard that is less than a preponderance of the evidence, that the outcome would have been different.  As the Third Circuit has stated, "This standard is not a stringent one."  Jacobs, 395

F.3d at 105.  Medina does not need to show that the trial court definitively would have sustained

a competency objection.  Medina need only show by a probability sufficient to undermine

confidence in the outcome that a competency objection would have been sustained.  Given the

indications in Marcos's testimony that he was not competent to testify, there is, at the very least,

a reasonable probability that a competency objection was meritorious.

Second, respondents' assumption about how the trial court would have ruled is flawed

because Daly never actually raised an objection to Marcos's competency and the trial court was

never called upon to pass judgment on Marcos's competency one way or another.[26]  A ruling on

the sufficiency of the evidence takes into consideration all evidence actually presented to the

jury, whether or not it was correctly presented.  Commonwealth v. Baker, 353 A.2d 454, 456 (Pa.

1976) (". . . in assessing the sufficiency of the evidence all evidence actually received at trial is

considered whether the rulings thereon were right or wrong").  Under Pennsylvania case law, in

making her post-trial ruling on the sufficiency of the evidence, Judge Stout was not to consider

---

[26]In post-oral argument briefs, respondents argue that the preliminary hearing court made
a finding as to Marcos's competency in the following exchange which took place at the end of
Marcos's re-direct at the preliminary hearing:

> Q. [BY PROSECUTION] Now, is what you are telling the Judge
> the truth?
> A. Yes.
> Q. Do you know the difference between the truth and a lie?
> THE COURT.  I am satisfied he is precocious.  He is a very bright
> young boy.

(Tr. 11/26/91 at 31; Resp. to Pet'r's Post-Argument Letter at 4.)  Respondents' try to stretch this
exchange into something it is not.  The preliminary hearing court does not state that it finds
Marcos Toro to be competent, nor was there an objection on which the court was ruling.  This
brief exchange certainly does not constitute a "searching judicial inquiry as to mental capacity"
as required by Pennsylvania law on juvenile witnesses.  Fultz, 462 A.2d at 1343.  There are also
no indications of any findings as to Marcos Toro's ability to perceive and remember events or his
ability to understand questions and answer intelligently.  For these reasons, this brief exchange in
the preliminary hearing cannot be considered a finding of competency by the court.

the competency of the evidence.  Rather, she was to view "all the evidence admitted at trial . . . in the light most favorable to the Commonwealth."  Commonwealth v. Jackson, 485 A.2d 1102, 1103 (Pa. 1984).  Additionally, "in viewing the evidence, [the reviewing court] remain[s] mindful that credibility determinations were a matter solely for the fact finder. . . ."  Commonwealth v. Murray, 597 A.2d 111, 114 (Pa. Super. Ct. 1991).  Thus, one cannot infer from Judge Stout's post-trial ruling any opinion that she might have had about Marcos's competency to testify, or even his credibility.  In applying the prejudice prong of Strickland, instead of speculating about what Judge Stout might have believed about Marcos Toro, one must instead examine the circumstances of Marcos's testimony through the applicable law on the competency of child witnesses at the time of Medina's trial.  As stated above, there is a reasonable probability that a challenge to Marcos's competency would have been meritorious.  Thus, I must now examine whether there is a reasonable probability that the outcome of the trial would have been different if Marcos had been disqualified from testifying.

Without Marcos's testimony, there is a reasonable probability that the jury would not have convicted Medina.  Marcos was the only witness at trial who testified to seeing the actual stabbing.  Medina I at 22.  A review of the other evidence offered at trial shows that Marcos's testimony was the key to the prosecution's case.  Hector Toro testified that he saw Medina with the knife in a neighborhood store, threatening to kill someone.  (Tr. 11/5/92 at 43-46.)  Hector did not see the stabbing.  (Id. at 47-48.)  Maria Caraballo testified that she saw Bogan run past her while holding his chest, but when she followed him she could not find him.  (Tr. 11/6/92 at 150-51.)  When she returned to her house, she saw Medina in front of her house, looking under a car.  (Id. at 152-53.)  Caraballo also did not see the stabbing.  (Id. at 156.)  The knife used to stab

39

Bogan was never found.  <u>Medina I</u> at 19.  While the forensic pathologist testified that the stab wound could have been caused by the type of "Rambo" knife that Hector said Medina possessed, the stab wound also could have been caused by a butcher knife or any knife with a single edge and a blade six inches in length.  (Tr. 11/6/92 at 214.)  Finally, Medina's white sweatshirt had no blood on it when he was stopped on the street shortly after the stabbing or when he was later arrested at a nearby bar.  (<u>Id.</u> at 180-81.)

It is clear from this review of the evidence presented at trial that Marcos's testimony was significant.  Indeed, when remanding Medina's case for an evidentiary hearing, the state Superior Court found that Marcos's testimony was key to the prosecution's case: "With Michael [Marcos] as the only eyewitness to the stabbing, and the prejudice from his testimony being self-evident, the issue is significant."  <u>Medina I</u> at 22.  Absent Marcos's testimony, there is a reasonable probability that the jury would have a reasonable doubt regarding Medina's guilt.  Thus, Medina has satisfied the prejudice prong of <u>Strickland</u>.

Medina has shown both (1) that his trial counsel, Ed Daly, was objectively unreasonable in failing to object to the competency of Marcos Toro and (2) that there was a reasonable probability that, had Daly objected, Marcos would have been disqualified from testifying and the jury would not have been able to find Medina guilty beyond a reasonable doubt.  Medina has satisfied both the deficient performance and the prejudice prong of <u>Strickland</u>.  The state court's conclusion that trial counsel was effective was an objectively unreasonable application of federal law.  Therefore, habeas relief is merited on the basis of this claim.

B.  Ineffective Assistance of Appellate Counsel for Failing to Raise Improper Prosecutorial
Remarks

      In the sixth claim of his habeas petition, Medina claims that appellate counsel was

ineffective for failing to preserve the issue of improper prosecutorial remarks made during

closing arguments.  Judge Hart concluded that this claim was procedurally defaulted because

Medina III, in denying Medina's PCRA appeal, found Medina had waived this claim by failing to

properly layer his claims of ineffective assistance of counsel against both of his appellate

lawyers.  (R&R at 5.)  Medina objects to Judge Hart's conclusion.  Medina argues that

Pennsylvania's requirement that a petitioner layer his ineffective assistance of counsel claim does

not amount to an independent and adequate state rule barring federal review of Medina's claim.

(Pet'r's Obj. to R&R at 9.)  It is indeed questionable whether Pennsylvania's layering

requirement constitutes an independent and adequate state rule barring federal review.[27]

---

[27]  To serve as an independent and adequate state rule barring federal review, a state rule
must be "firmly established and regularly followed."  Lee v. Kemma, 534 U.S. 362, 376 (2002).
The Third Circuit has previously explained that a state procedural rule is "adequate" only if the
rule is "consistently or regularly applied."  Jermyn v. Horn, 266 F.3d 257, 278 (3d. Cir. 2001).  In
Commonwealth v. McGill, 832 A.2d 1014 (Pa. 2003), the Pennsylvania Supreme Court
"recognized that it has not been entirely clear in the past as to what is required of a PCRA
petitioner seeking to plead and prove a layered claim of ineffectiveness, and, accordingly,
indicated a general preference to remand to the PCRA court for further development . . . ."
Commonwealth v. D'Amato, 856 A.2d 806, 812 (Pa. 2004) (discussing McGill).  Given that
D'Amato and McGill advocate remanding a PCRA petition to the trial court to give petitioner a
chance to cure a failure to correctly layer an ineffectiveness claim, it is questionable just how
"firmly established and regularly followed" or "consistently or regularly applied" Pennsylvania's
layering requirement was.  See Jermyn, 266 F.3d at 278-79 (finding no procedural default where
state waiver rule was not consistently applied in death penalty cases).  In Commonwealth v.
Grant, 813 A.2d 726, the Pennsylvania Supreme Court abandoned its requirement that
ineffectiveness claims must be raised at the earliest opportunity and adopted a new rule that
defendants should wait until collateral review to raise all ineffectiveness claims.  Thus, after
Grant, there is no longer a need to layer ineffectiveness claims.  The new rule does not apply to
this case because Medina's direct appeal was concluded prior to the court's announcement in

However, I deny Medina's sixth claim without reaching a conclusion as to whether it is procedurally defaulted because the underlying claim of ineffective assistance of appellate counsel for failing to raise a claim of improper prosecutorial remarks is without merit.

Medina argues that the following statements contained in the Commonwealth's closing arguments were improper:

> . . . [U]se your common sense.  At 9:30 at night, on a Friday night on a nice evening . . . **the only one with the guts to come forward was a 12 year old boy.**  (Tr. 11/9/92 at 273) (emphasis added).
> . . .
> **Nobody else wanted to come forward.  Nobody else wanted to say what they saw.**  (Id. at 274) (emphasis added).
> . . .
> The defense tries to make you say a guilty person would have left [the scene].  **I say not necessarily, not in the kind of tight neighborhood where people don't come forward, where nobody wants to say what they saw.**  (Id. at 279) (emphasis added).

(Pet'r's Obj. to R&R at 5.)  Medina argues that these comments constituted improper prosecutorial vouching and referred to evidence not in the record and that appellate counsel was ineffective for failing to raise this claim on direct appeal.  (Id. at 4, 10.)

On Medina's direct appeal, a claim of improper prosecutorial remarks would have been analyzed under Pennsylvania state law,[28] which holds:

> [C]omments by a prosecutor do not constitute reversible error

_____

Grant.  See D'Amato, 856 A.2d at 812.

[28]I must analyze this claim of improper prosecutorial remarks claim under the state standard because the prosecutorial vouching that Medina alleges is not a violation of the federal constitution.  As stated by the Third Circuit, "This Court en banc has held that vouching that is aimed at the witness's credibility and is based on extra-record evidence is deemed non-constitutional error."  United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 286 (3d Cir. 1999) (citing United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995)).

> unless the unavoidable effect of such comments would be to
> prejudice the jury, forming in their minds fixed bias and hostility
> toward the defendant so that they could not weigh the evidence
> objectively and render a true verdict. . . . Prosecutorial misconduct
> will not be found where comments were based on the evidence or
> proper inferences therefrom or were only oratorical flair.

Commonwealth v. Hawkins, 701 A.2d 492, 503 (Pa. 1997) (citing Commonwealth v. D'Ambro,
456 A.2d 140, 144 (Pa. 1983); Commonwealth v. Marshall, 633 A.2d 1100, 1110 (Pa. 1993)).

As Medina's PCRA counsel acknowledged, the Pennsylvania standard for the granting of
a new trial due to prosecutorial misconduct is an extremely strict standard.  (Pet'r's Obj. to R&R
Ex. A at 10.)  In this case, it is a standard that Medina cannot meet.  Although Medina argues that
the prejudicial effects of the prosecutor's comments "is undeniable given the scant evidence
against Mr. Medina other than Marcos Toro's testimony and the contradictory nature of that
testimony itself" (id. at 6), Medina fails to show that those comments were more than simply
oratorical flair.  These comments certainly are not egregious enough to lead to the "unavoidable
effect" of the jury forming "fixed bias and hostility" toward Medina.  Medina is unable to show a
reasonable probability that the Pennsylvania Superior Court would have granted his claim of
improper prosecutorial remarks and remanded for a new trial.

Because Medina cannot show a reasonable probability that the state Superior Court would
have granted his claim of improper prosecutorial remarks, Medina's claim of ineffective
assistance of appellate counsel must fail.  As stated above, to establish prejudice under
Strickland, there must be "a reasonable probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different."  Wiggins, 539 U.S. at 534 (quoting
Strickland, 466 U.S. at 694) (internal quotations omitted).  The Third Circuit stated in United

43

States v. Barnes, 324 F.3d 135, 139 (3d Cir. 2003), "an attorney's performance cannot have

prejudiced a defendant if his alleged ineffectiveness was the failure to advance an unmeritorious

claim that could not have been successful had it been advanced."  As stated above, Medina fails

to show a reasonable probability that the state court would have found his claim of improper

prosecutorial remarks to be meritorious.  Therefore, Medina fails to meet the prejudice prong of

Strickland and his claim of ineffective assistance of appellate counsel is denied.


C.  Medina's Remaining Claims

        Two of Medina's claims remain to be addressed.  Medina's fourth claim alleges

ineffective assistance of trial and appellate counsel in relation to trial counsel's failure to

introduce medical records establishing that he was incapable of committing the offense.  Judge

Hart noted that the PCRA court and the Pennsylvania Superior Court concluded that counsel was

not ineffective because the medical records at issue were not relevant to the time when the victim

was stabbed:

> Medina's records show that on May 12, 1991, he sustained a
> gunshot wound to the head that caused initial sensory and motor
> deficits.  The records also show that two weeks after the injury,
> Medina required a walker for ambulation and was receiving
> occupational and physical therapy to address his physical
> symptoms. . . .  We find Medina's claim unavailing because he
> makes no attempt to argue that the condition reflected in his
> medical records as of May 1991 persisted five months later when
> he stabbed the victim.  The trial court properly recognized that
> without such an offer of proof the relevance of the records is
> questionable and does not establish that his claim of ineffective
> assistance possesses arguable merit.

Medina III at 9-10; (R&R at 22).  The R&R noted that because the records at issue do not

44

comment on Medina's condition at the time of the stabbing, Medina cannot establish that introduction of the documents would have affected the outcome of trial.  (R&R at 22.) Therefore, Judge Hart concluded that this claim of ineffective assistance of counsel must fail. (Id.)  Neither party has objected to Judge Hart's finding that Medina's fourth claim is without merit.  Therefore, I adopt without comment the finding of the R&R as to this claim.

Medina's fifth claim alleges that the trial court rendered his counsel ineffective by admonishing trial counsel in front of the jury and that appellate counsel was ineffective for failing to raise this issue.  Judge Hart found this claim to be procedurally defaulted.  On Medina's PCRA appeal, the state Superior Court did not consider this claim on its merits.  (R&R at 4-5.) Rather, the court found that Medina waived this claim by failing to properly layer his claim of ineffective assistance of appellate counsel to include specific allegations of ineffectiveness on the part of both of his previous appellate attorneys. (Id.)  Neither party has objected to Judge Hart's finding that Medina's fifth claim is procedurally defaulted.  Therefore, I adopt without comment the finding of the R&R as to this claim.

## V.  CONCLUSION

For the reasons set forth above, the state court's denial of Medina's claim of ineffective assistance of trial counsel for failing to object to the competency of Marcos Toro was an unreasonable application of clearly established federal law.  Therefore, Medina's petition is granted on the basis of this claim.

## <u>ORDER</u>

**AND NOW**, this __2nd___ day of June 2005, it is **ORDERED** that the petition for writ of habeas corpus is **GRANTED**.

It is **FURTHER ORDERED** that the execution of the writ is **STAYED** for 180 days to permit the Commonwealth to retry the petitioner.

S/Anita B. Brody

_____

ANITA B. BRODY, J.

_____Copies via ECF on          to:          Copies **MAILED** on        to:

O:\ABB\Medina-opinion.wpd

46